JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Ashley Franks

**(b)** County of Residence of First Listed Plaintiff  Philadelphia
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Derek Smith Law Group, PLLC
1835 Market Street, Suite 2950
Philadelphia, PA 19103 (215) 391-4790

## DEFENDANTS

University of Pennsylvania

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ❏ 1  U.S. Government Plaintiff | ☒ 3  Federal Question *(U.S. Government Not a Party)* |
| ❏ 2  U.S. Government Defendant | ❏ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | ❏ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | | | ❏ 835 Patent - Abbreviated New Drug Application | ❏ 460 Deportation |
| | | **PERSONAL PROPERTY** | | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | ❏ 710 Fair Labor Standards Act | ❏ 861 HIA (1395ff) | ❏ 485 Telephone Consumer Protection Act |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 720 Labor/Management Relations | ❏ 862 Black Lung (923) | ❏ 490 Cable/Sat TV |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Medical Malpractice | ❏ 385 Property Damage Product Liability | ❏ 740 Railway Labor Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 196 Franchise | | | ❏ 751 Family and Medical Leave Act | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| | | | | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ❏ 893 Environmental Matters |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | ❏ 791 Employee Retirement Income Security Act | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 895 Freedom of Information Act |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 896 Arbitration |
| ❏ 230 Rent Lease & Ejectment | ☒ 442 Employment | ❏ 510 Motions to Vacate Sentence | | | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | ❏ 950 Constitutionality of State Statutes |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ❏ 2 Removed from State Court   ❏ 3 Remanded from Appellate Court   ❏ 4 Reinstated or Reopened   ❏ 5 Transferred from Another District *(specify)*   ❏ 6 Multidistrict Litigation - Transfer   ❏ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC §2000e (Title VII)

Brief description of cause:
Employment discrimination based on national origin

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*:
JUDGE _____   DOCKET NUMBER _____

DATE
08/20/2019

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

Ashley Franks              :            CIVIL ACTION

v.             :

University of Pennsylvania     :         NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.       ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.       ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.       ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)       ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.       (✗)

08/20/2019      Ian M. Bryson, Esq.      Plaintiff
**Date**           **Attorney-at-law**         **Attorney for**

215-391-4790     215-893-5288     ian@dereksmithlaw.com
**Telephone**         **FAX Number**         **E-Mail Address**

(Civ. 660) 10/02

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: 1501 S. 17th Street, Apt 321, Philadelphia, PA 19146

Address of Defendant: University of Pennsylvania, Philadelphia, PA 19104

Place of Accident, Incident or Transaction: Philadelphia and Botswana, Africa

---

**RELATED CASE, IF ANY:**

Case Number: N/A                Judge: N/A                Date Terminated: N/A

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐    No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☐    No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?    Yes ☐    No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?    Yes ☐    No ☒

I certify that, to my knowledge, the within case ☐ is / ☒ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 08/20/2019          _____Attorney-at-Law / Pro Se Plaintiff_____          321359
                                                                        *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.    Federal Question Cases:**

- ☐ 1.  Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2.  FELA
- ☐ 3.  Jones Act-Personal Injury
- ☐ 4.  Antitrust
- ☐ 5.  Patent
- ☐ 6.  Labor-Management Relations
- ☒ 7.  Civil Rights
- ☐ 8.  Habeas Corpus
- ☐ 9.  Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
      *(Please specify):* _____

**B.    Diversity Jurisdiction Cases:**

- ☐ 1.  Insurance Contract and Other Contracts
- ☐ 2.  Airplane Personal Injury
- ☐ 3.  Assault, Defamation
- ☐ 4.  Marine Personal Injury
- ☐ 5.  Motor Vehicle Personal Injury
- ☐ 6.  Other Personal Injury *(Please specify):* _____
- ☐ 7.  Products Liability
- ☐ 8.  Products Liability – Asbestos
- ☐ 9.  All other Diversity Cases
      *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Ian M. Bryson, Esq. , counsel of record *or* pro se plaintiff, do hereby certify:

- ☒ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

- ☐ Relief other than monetary damages is sought.

DATE: 08/20/2019          _____Attorney-at-Law / Pro Se Plaintiff_____          321359
                                                                        *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

**DEREK SMITH LAW GROUP, PLLC**
IAN M. BRYSON, ESQUIRE
Attorney ID No. 321359
1835 Market Street, Suite 2950
Philadelphia, PA 19103
(215) 391-4790
ian@dereksmithlaw.com
*Attorneys for Plaintiff, Ashley Franks*

## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASHLEY FRANKS, | : Civil Action No. |
| Plaintiff, | : **COMPLAINT** |
| v. | : JURY TRIAL DEMANDED |
| UNIVERSITY OF PENNSYLVANIA, | |
| Defendant. | |

## NATURE OF THE ACTION

1. This is an action for relief from violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII").

2. Plaintiff Ashley Franks seeks declaratory relief, actual damages, compensatory damages, punitive damages, pre- and post-judgment interest, reasonable attorneys' fees and costs of suit as remedies for Defendant's violations of her rights.

## PARTIES

3. Plaintiff Ashley Franks ("Ms. Franks") is an adult individual resident of Philadelphia County and a citizen of the Commonwealth of Pennsylvania.

4. Defendant University of Pennsylvania ("Penn") is a private university with its main campus and principal place of business located in Philadelphia, Pennsylvania.

1

5. At all relevant times, Penn acted or failed to act through its agents, servants and employees, each of whom were acting within the course and scope of their employment.

6. Penn was an "employer" and Ms. Franks was an "employee" within the meaning of the applicable law.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES UNDER TITLE VII

7. On April 9, 2019, Plaintiff timely filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII.

8. On May 28, 2019, EEOC issued Plaintiff a Notice of Right to Sue Within 90 Days.

9. Plaintiff has timely filed this action and has complied with all administrative prerequisites to bring this lawsuit.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because it involves questions of federal law under Title VII.

11. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because Defendant is subject to personal jurisdiction here.

12. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## FACTS

13. On March 1, 2018, Ms. Franks was hired as a Social Work Intern for Stepping Stones International (SSI) in Mochudi, Botswana through the University of Pennsylvania's Global Internship Program (GIP); made possible by the Botswana-UPenn Partnership (BUP).

2

14. At the time of acceptance, Ms. Franks was granted a funding award in the amount of $3,560.00 (or approximately $7.42/hour for working 40 hours per week for 3 months).

15. By March 15th Ms. Franks signed a commitment contract confirming her acceptance of her position and the terms associated with her funding award. She also vaguely worked out housing arrangements with BUP. Housing accommodations would be at a homestay in Mochudi with the Operations Manager at SSI, at a rate of $170/month.

16. Before traveling to Botswana, Ms. Franks purchased a one-way ticket from New York to Botswana. She was quickly advised (by required documentation and by BUP/GIP staff) to purchase a return ticket, though she was skeptical about doing so because she didn't know where in Africa she would be departing from. She had already anticipated taking a few days after her internship to travel. However, she obeyed the instructions given by her superiors and purchased a return ticket from Gaborone, Botswana to New York.

17. On May 20th Ms. Franks arrived in Botswana. Early in the day she had a very brief orientation with Liza Rissik, Visitor Coordinator for BUP. Later that day, Ms. Franks visited SSI for the first time, where she met Lisa Jamu, Managing Director at SSI; Eva Kebadile, Program Coordinator for the Psychosocial Support Department at SSI; Beauty Mogasha, Programs Manager at SSI; and Tinny Setei, Operations Manager at SSI and Ms. Franks' host. Although it was indicated in writing that Lisa Jamu would be Ms. Franks' direct supervisor, Lisa introduced Eva as Ms. Franks' supervisor. Lisa stated that since Ms. Franks would most likely be working in the Psychosocial Support Department, it would be best for Eva supervise her. Beauty and Lisa identified themselves as point persons for support if Ms. Franks should have any challenges either in her homestay or at Stepping Stones. Lisa said that on the next day, May 21st, Ms. Franks would be sitting

3

down with Eva and Beauty to discuss her goals and expectations for the duration of her internship.

18. On May 21st Ms. Franks sat down with Beauty to discuss general organizational expectations, tips on travelling in Africa, and job placement. Beauty said that Ms. Franks was best suited to work in the Psychosocial Support (PSS) Department and said she would send Ms. Franks' her job description as soon as possible.

19. Neither Beauty nor Eva asked Ms. Franks about her goals for the summer or about what objectives she should be focused on. In fact, Ms. Franks' supervisor Eva actively avoided her throughout her first two weeks at Stepping Stones. Ms. Franks was never invited to work on any projects or to join any activities.

20. Furthermore, on May 31st, Eva directed Ms. Franks not to attend a staff meeting that she was invited to, where all other staff members were present. Instead, Eva handed Ms. Franks approximately 6 pages of illegible handwritten notes to transcribe while the rest of the staff attended the meeting. At this point (10 days into Ms. Franks' internship) Eva still hadn't met with Ms. Franks individually. After the staff meeting ended, Ms. Franks notified Beauty about her concerns about being excluded from meetings; being ignored by her supervisor; not having met with anyone to discuss her individual goals and objectives; and not having a clear job description (Beauty sent Ms. Franks her job description shortly thereafter).

21. On June 1st, Eva and Ms. Franks agreed to meet on June 4th to discuss her goals and objectives for the summer. In the interim, Ms. Franks and two staff members in the PSS Department were leading a session with SSI participants when the two staff members

4

excluding Ms. Franks from participating by discussing the subject matter completely in Setswana, leaving Ms. Franks confused and unable to effectively collaborate.

22. On June 4th, Ms. Franks notified Lisa Jamu, in person, about her concerns regarding her internship. On this day, Eva and Ms. Franks also finally met. During their meeting, Eva spoke to Ms. Franks in a hostile tone. She communicated arbitrary expectations about Ms. Franks' conduct at Stepping Stones, such as not eating in certain halls, where to dispose of sanitary napkins, and punctuality. Ms. Franks suggested that they identify key objectives/projects for her to work on over the summer. Eva agreed that they could work on drafting these.

23. By June 14th, Ms. Franks was almost a month into her internship with no clear objectives. Ms. Franks approached Eva again and asked to review and confirm her objectives for her internship. Eva went through each objective and pushed back against all of them. She neither confirmed nor denied whether Ms. Franks' objectives would be attainable for the duration of her internship. Instead, Eva attacked Ms. Franks. Eva opened the discussion asking, "Have you ever worked full time? Like, around other people?" Eva also stated her believe that Ms. Franks is "overly critical." She asked Ms. Franks, "Do you ever ask people how they feel about you?" Eva even threatened that it would be "very hard to serve participants without being in good favor with the staff."

24. Ms. Franks responded stating she felt ostracized by the PSS department. Eva stated that a possible reason she and the staff might be excluding Ms. Franks was because Ms. Franks had complained to Beauty on May 31st about being excluded from meetings and activities that everyone else on the staff was invited to. Eva also communicated "worry" and "concern" about Ms. Franks' macro-level interests, which she said her office

"doesn't do." Eva proposed that Ms. Franks and the PSS department have a meeting. Ms. Franks did not understand the purpose of the meeting as Eva's concerns seemed motivated by a discriminatory animus against Ms. Franks and unrelated to Ms. Franks' professional performance. Therefore, Ms. Franks requested that Beauty be present for the proposed meeting. Eva denied Ms. Franks' request on the spot. Ms. Franks then requested if Julia Martell, the consultant for the department, could be present. Eva agreed to this and scheduled the meeting for the following week. Eva and Ms. Franks never accomplished the original goal of reviewing and agreeing on her objectives for the internship.

25. In a follow-up email to Eva, Ms. Franks reiterated her concerns about being not being given clear objectives. Eva never responded. Ms. Franks also with Julia to discuss the meeting she had with Eva and the proposed upcoming with the PSS department. Ms. Franks asked Julia if she would support Ms. Franks with her objectives and serve as a reference when Ms. Franks left Stepping Stones. Julia agreed to support Ms. Franks and be a reference for her. Julia strongly disagreed with the idea of a meeting between Ms. Franks and the PSS staff, as she predicted it would be a very inappropriate meeting with the whole PSS staff being against Ms. Franks. Hence, Julia requested for the meeting to be cancelled.

26. Eva then started targeting Ms. Franks. On one occasion, Eva instructed two participants to walk away from Ms. Franks when she was discussing an activity with them. On another occasion, on June 19th, Eva walked into the computer room as Ms. Franks was typing a blog post for the GIP and hovered over Ms. Franks' shoulder, arbitrarily criticizing the content of the blog post. Ms. Franks complained about Eva's recent actions

6

to Beauty, who agreed with Eva. At this time, Ms. Franks told Beauty that she did not feel comfortable working under Eva's supervision because it seemed like Eva was targeting her.

27. After discussing Eva's behavior and Ms. Franks' overall experience at Stepping Stones, Beauty suggested that Ms. Franks' supervisor be changed from Eva to Julia. Ms. Franks agreed with this suggestion.

28. This same week, Ms. Franks notified the GIP back in the United States about her concerns. She updated the GIP again on June 19th when her supervisor was officially changed stating she felt like her concerns were being addressed since she would no longer have to report to Eva.

29. Then, at 7:41 pm on June 19th, Ms. Franks received the following message from Liza Rissik: "Hi Ashley the driver will collect you and Latisha (another intern) from Stepping Stones tomorrow at 9am. You are to come in and have a chat with myself and the interim Director of BUP." This was the second of five (5) meetings Ms. Franks would be pulled into within a week's time frame.

30. On June 20th Latisha and Ms. Franks were pulled out of work for the day and brought to BUP to meet with Liza and Tonya, the interim director of BUP. When they arrived, Liza notified Ms. Franks and Latisha that she just wanted to check in with them, since she hadn't done so since their arrival in Botswana. Ms. Franks communicated concerns about feeling unwelcome at Stepping Stones and concerns she had about safety in her homestay.

31. Liza said she would follow-up with the necessary parties about Ms. Franks' concerns. Liza stated she wanted to talk to Lisa Jamu about Ms. Franks' concerns. Ms. Franks

7

stated she was concerned that Liza would retaliate against her for reporting her concerns about being singled out. Ms. Franks communicated various safety concerns about this. Liza then admitted that Lisa might "be on her people's side." But she promised she would exercise caution when bringing Lisa up to date on these issues.

32. The next day, on June 20th, Ms. Franks met with Julia to go over her objectives and goals. The meeting was productive, and Julia agreed that all of Ms. Franks' identified goals were attainable. She told Ms. Franks to "consider this a new internship from this day forward." That night, Julia emailed Ms. Franks various policies and documents to review to inform her identified objectives. Ms. Franks felt supported. Things felt hopeful.

33. However, on Friday, June 22nd, Beauty asked Ms. Franks to step into a meeting with herself and Lisa Jamu. Lisa started the meeting saying she "had a few concerns." Lisa noted that she "didn't think Ms. Franks was adjusting culturally." She asked Ms. Franks if she had taken time to "think about why people at Stepping Stones didn't like her."

34. Ms. Franks said she didn't think it was fair to put that responsibility on her as a visitor. Ms. Franks said she felt unwelcome and questioned why the burden was being placed on her to figure out why she was "making people" feel hostile toward her. She thought this was very unprofessional, considering it was Lisa's duty to ensure that Ms. Franks was adjusting as a visitor and that her staff was supportive to that end.

35. It was especially alarming to Ms. Franks when Lisa said to her "you can't bring America here." When Ms. Franks asked Lisa to elaborate on what she meant by that, Lisa explained that Ms. Franks would "have to leave her culture behind in America to effectively adjust at Stepping Stones."

8

36. Ms. Franks voiced that the meeting felt very unsafe to her and that overall the work environment at Stepping Stones was growing more and more toxic. Among various comments, Lisa noted that Ms. Franks is "not special," and that she's "aggressive."

37. Beauty stated, "With Swana people, if you love us, we love you." Ms. Franks became highly concerned about her safety during the meeting. When the meeting was over, Ms. Franks was sent home for the rest of the day, presumably to deescalate the situation.

38. That afternoon, Lisa Rissik sent Ms. Franks a message on Whatsapp saying: "I had a call from Lisa Jamu…Tonya and I would like you and Latisha to come and see us on Monday…we would like you to come spend the weekend at [Pilane]." That night, a driver came to get Ms. Franks and Latisha and they left their village and went into the city for the weekend.

39. On Monday, June 25th, Ms. Franks walked into the meeting with Lisa Jamu, Liza Rissik, and Tonya. When she arrived, Ms. Franks was informed she was being dismissed from the center in Mochudi at Stepping Stones International. She was told that it wouldn't be a "dismissal" but that maybe Ms. Franks could be relocated to do more "desktop" work. Ms. Franks asked for documentation to support their decision. Liza said that Lisa would retroactively gather documentation and give Ms. Franks the chance to answer to it. That never happened.

40. After the meeting, Lisa and Tonya told Ms. Franks she would need to stay away from Stepping Stones and they also attempted to remove Ms. Franks from the entire village of Mochudi. Ms. Franks agreed to stay away from Stepping Stones as she did not want to escalate the situation. However, she objected to being removed from the entire village as

9

that would be too isolating and displacing for her since she was alone in a foreign country.

41. Ms. Franks got in contact with Nigel Cossar (the director of the GIP) to express her concerns over the prospect of being ejected from her homestay in Mochudi. Ms. Franks had already paid for her accommodations, she was not posing a threat to anyone, she had prior travel arrangements that would require her to remain Mochudi, and her only trusted colleague was in Mochudi. Tonya eventually agreed to "let" Ms. Franks stay in Mochudi. There forward, Ms. Franks had scheduled phone calls with Nigel and Jillian Cener (the GIP Manager) to discuss the chain of events.

42. By Wednesday, June 27th, Jillian and Nigel confirmed with upper management at Stepping Stones and BUP that Ms. Franks' internship would, in fact, be ending. In response to this decision, Ms. Franks made Jillian and Nigel aware of her logistical concerns regarding her return flight, her prepaid homestay accommodations, her GIP contract, her pre-existing travel plans and more. Nigel mentioned being able to "support" Ms. Franks with her return flight and Jillian sent Ms. Franks an email on June 28th to notify her that she would not be bound to the clause in her contract that said she would return some or all of her funding award should her internship end early.

43. On July 4th, Ms. Franks officially vacated her homestay and left Botswana.

44. Defendant discriminated against Plaintiff in the terms and conditions of their employment because of Plaintiff's national origin.

45. Defendant retaliated against Plaintiff because she reported or otherwise opposed Defendant's illegal conduct.

10

46. Defendant subjected Plaintiff to harassment and a hostile work environment based on national origin.

47. Plaintiff claims a continuous practice of discrimination and make all claims herein under the continuing violations doctrine.

48. Plaintiff claims unlawful constructive and/or unlawful actual discharge.

49. As a direct result of Defendant's unlawful discrimination and retaliation, Plaintiff has been forced to seek ongoing medical treatment to treat her emotional distress. Prior to events complained of in this case, Plaintiff had no history of inpatient mental health intervention, psychotropic treatment or any other history of outpatient counseling. Plaintiff further claims aggravation, activation and/or exacerbation of any preexisting condition.

## CAUSES OF ACTION

### COUNT I
### TITLE VII DISPARATE TREATMENT
### 42 U.S.C. § 2000e-2

50. Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

51. Title VII provides, in relevant part, that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

52. Title VII further provides that "un unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a

11

motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m).

53. Penn engaged in unlawful employment practices prohibited by Title VII by intentionally discriminating against Plaintiff with respect to her compensation, terms, conditions, training and privileges of employment because of her national origin.

54. Penn subjected Plaintiff to adverse tangible employment actions—defined as significant changes in Plaintiff's employment status, discipline, denial of training, failure to promote, reassignment with significantly different job responsibilities, and decisions causing changes in significant changes in her employment benefits.

55. Plaintiff's protected characteristics (national origin) played a determinative factor in Penn's decisions.

56. Penn cannot show any legitimate nondiscriminatory reasons for its employment practices and any reasons proffered by Penn for its actions against Plaintiff is pretextual and can readily be disbelieved.

57. Alternatively, Plaintiff' protected status played a motivating part in Penn's decisions even if other factors may also have motivated its actions against Plaintiff.

58. Penn acted with the intent to discriminate.

59. Penn acted upon a continuing course of conduct.

60. As a result of Penn's violations of Title VII, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**WHEREFORE**, Plaintiff demands judgment against Defendant and prays for the following relief: (1) an award of compensatory damages in an amount consistent with Title VII; (2) an award of reasonable attorneys' fees and costs of this action in accordance with Title VII; (3) an award of pre- and post-judgment interest and court costs as further allowed by law; (4) an adjudication and declaration that Penn's conduct as set forth herein is in violation of Title VII; and (5) all additional general and equitable relief to which Plaintiff is entitled.

<u>**COUNT II**</u>
**TITLE VII HOSTILE WORK ENVIRONMENT**
**42 U.S.C. § 2000e-2**

61. Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

62. Title VII also prohibits hostile work environment harassment, defined as unwanted comments or conduct regarding the plaintiff's protected characteristics that have the purpose or effect of unreasonably interfering with the terms and conditions of the plaintiff's employment. <u>Harris v. Forklift Systems</u>, 510 U.S. 17, 21 (1993).

63. An employer is strictly liable for supervisor harassment that "culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742 (1998).

64. Respondeat superior liability for the acts of non-supervisory employees exists where "the defendant knew or should have known of the harassment and failed to take prompt remedial action. <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1486 (3d Cir. 1990).

65. Employer liability for co-worker harassment also exists where "the employer failed to provide a reasonable avenue for complaint." <u>Huston v. Procter & Gamble Paper Prods. Corp.</u>, 568 F.3d 100, 105 (3d Cir. 2009).

13

66. The Third Circuit has held that the retaliation provision of Title VII "can be offended by harassment that is severe or pervasive enough to create a hostile work environment." Jensen v. Potter, 435 F.3d 444, 446 (3d Cir. 2006).

67. Here, Defendant's conduct occurred because of Plaintiff's legally protected characteristics and was severe or pervasive enough to make a reasonable person of the same legally protected classes believe that the conditions of employment were altered and that the working environment was intimidating, hostile or abusive.

68. The harassing conduct directly refers to Plaintiff's national origin.

69. Penn delegated to Plaintiff's supervisors the authority to control the work environment and they abused that authority to create a hostile work environment.

70. Harassing conduct filled the environment of Plaintiff's work area.

71. Penn knew that the harassing conduct filled Plaintiff's work environment.

72. Harassing conduct occurred daily.

73. Harassing conduct caused Plaintiff to sustain severe emotional distress resulting in physical illness and serious psychological sequelae.

74. Plaintiff subjectively regarded the harassing conduct as unwelcome and unwanted and objectively opposed the conduct.

75. The conduct was both severe and pervasive.

76. The conduct was physically threatening and humiliating.

77. The conduct unreasonably interfered with Plaintiff's work performance.

78. The conduct was so extreme that it resulted in material changes to the terms and conditions of Plaintiff's employment.

79. Penn provided a futile avenue for complaint.

14

80. Penn retaliated against Plaintiff for her complaints.

81. Penn acted upon a continuing course of conduct.

82. As a result of Penn's violations of Title VII, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**WHEREFORE**, Plaintiff demands judgment against Defendant and prays for the following relief: (1) an award of compensatory damages in an amount consistent with Title VII; (2) an award of reasonable attorneys' fees and costs of this action in accordance with Title VII; (3) an award of pre- and post-judgment interest and court costs as further allowed by law; (4) an adjudication and declaration that Defendant's conduct as set forth herein is in violation of Title VII; and (5) all additional general and equitable relief to which Plaintiff is entitled.

## COUNT III
### TITLE VII RETALIATION
### 42 U.S.C. § 2000e-3

83. Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

84. Title VII protects employees from retaliation for attempting to exercise their rights under the Act:

> 42 U.S.C. § 2000e-3. Other unlawful employment practices
>
> (a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings. It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

15

85. The Supreme Court in <u>Burlington v. N. & S.F. Ry. V. White</u>, 548 U.S. 53, 68 (2006) held that a cause of action for retaliation under Title VII lies whenever the employer responds to protected activity in such a way that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."

86. Informal complaints and protests can constitute protected activity under the "opposition" clause of 42 U.S.C. § 2000e-3(a). <u>Moore v. City of Philadelphia</u>, 461 F.3d 331, 343 (3d Cir. 2006) ("Opposition to discrimination can take the form of informal protests of discriminatory employment practices, including making complaints to management.").

87. Title VII's anti-retaliation provision also protects employees who speak out about discrimination by answering questions during an employer's internal investigation. <u>Crawford v. Metropolitan Gov't of Nashville and Davidson Cty., Tennessee</u>, 555 U.S. 271, 277 (2009) (declaring that there is "no reason to doubt that a person can 'oppose' by responding to someone else's question just as surely as by provoking the discussion, and nothing in the statute requires a freakish rule protecting an employee who reports discrimination on her own initiative but not one who reports the same discrimination in the same words when her boss asks a question.").

88. Retaliation need not be job-related to be actionable under Title VII—an employer can effectively retaliate against an employee by taking actions not directly related to her employment or by causing her harm outside the workplace. <u>White</u>, 548 U.S. at 61-62 (rejecting authority from the Third Circuit and others requiring that the plaintiff suffer an adverse employment action in order to recover for retaliation).

89. "[A] plaintiff need not prove the merits of the underlying discrimination complaint, but only that '[she] was acting under a good faith, reasonable belief that a violation existed.'"

16

Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996); Griffiths v. CIGNA Corp., 988 F.2d 457, 468 (3d Cir. 1993); Sumner v. United States Postal Service, 899 F.2d 203, 209 (2d Cir. 1990), overruled on other grounds by Miller v. CIGNA Corp., 47 F.3d 586 (3d Cir.1995).

90. An employee need not be a member of a protected class to be subject to actionable retaliation under Title VII. See Moore, 461 F.3d at 342 ("Title VII's whistleblower protection is not limited to those who blow the whistle on their own mistreatment or on the mistreatment of their own race, sex, or other protected class.")

91. Here, Penn discriminated against Plaintiff because of her protected activity under Title VII.

92. Plaintiff was acting under a reasonable, good faith belief that her right to be free from discrimination on the basis of national origin was violated.

93. Plaintiff was subjected to materially adverse actions at the time or after the protected conduct took place.

94. There was a causal connection between Penn's materially adverse actions and Plaintiff's protected activity.

95. Penn's actions were "materially adverse" because they were serious enough to discourage a reasonable worker from engaging in protected activity.

96. Penn acted upon a continuing course of conduct.

97. Plaintiff will rely on a broad array of evidence to demonstrate a causal link between her protected activity and Penn's actions taken against her, such as the unusually-suggestive proximity in time between events, as well as Defendant's antagonism and change in demeanor toward Plaintiff after Defendant became aware of Plaintiff's protected activity.

17

98. As a result of Penn's violations of Title VII, Plaintiff has suffered damages, including, but not limited to: past and future lost wages, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, reputational harm, diminishment of career opportunities, and other harm, both tangible and intangible.

**WHEREFORE**, Plaintiff demands judgment against Defendant and prays for the following relief: (1) an award of compensatory damages in an amount consistent with Title VII; (2) an award of reasonable attorneys' fees and costs of this action in accordance with Title VII; (3) an award of pre- and post-judgment interest and court costs as further allowed by law; (4) an adjudication and declaration that Defendant's conduct as set forth herein is in violation of Title VII; and (5) all additional general and equitable relief to which Plaintiff is entitled.

## COUNT IV
## DECLARATORY RELIEF ALLEGATIONS

99. Plaintiff incorporates by reference each and every allegation made in the above paragraphs of this complaint.

100.     A present and actual controversy exists between Plaintiff and Defendant concerning their rights and respective duties.

101.     Plaintiff contends Defendant violated her rights as complained of herein.

102.     Plaintiff is informed and believe that Defendant denies these allegations.

103.     Declaratory relief is therefore necessary and appropriate.

**WHEREFORE**, Plaintiff seeks a judicial declaration of the rights and duties of the respective parties.

18

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues raised by this complaint.

Respectfully submitted,

**DEREK SMITH LAW GROUP, PLLC**

By:_____

IAN M. BRYSON, ESQUIRE
Attorney ID No. 321359
1835 Market Street, Suite 2950
Philadelphia, PA 19103
(215) 391-4790
ian@dereksmithlaw.com
*Attorneys for Plaintiff, Ashley Franks*

Dated: _8/20/2019_

19